## Abolition of Railroad Crossings

LEWIS, Deputy Attorney General, December 3, 1943.—You have asked to be advised on the following question:

"Under the provisions of section 409 of the Public Utility Law, does the Public Utility Commission have jurisdiction over the abolition of crossings located on a line of railroad which is a part of an interstate system, or which is owned by an interstate system, where the Interstate Commerce Commission has approved the abandonment of said line?"

Your request states that, in those cases where a railroad company operating within the Commonwealth of Pennsylvania desires to abandon the whole or a portion of a line which is a part of an interstate system, application for approval of the abandonment is filed with the Interstate Commerce Commission, and that body forwards a copy of such application to the Governor, who then refers it to the Public Utility Commission. When your commission receives such an application it ascertains whether there are any highway crossings located on the line proposed to be abandoned, and if such be the fact the commission institutes a formal investigation directed to the railroad company involved, requiring it to show cause why it should not make application to the commission for permission to abolish such highway crossings. In those cases where this course has been followed the railroads have filed motions to dismiss, and the basis of such motions is a contention that the Pennsylvania Public Utility Commission lacks jurisdiction because of a construction placed on section 409 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1179, as amended by the Act of September 28, 1938, P. L. 44, by the Superior Court in Jennings, Trustee, v. Pennsylvania Public Utility Commission, 140 Pa. Superior Ct. 569 (1940).

Section 409 of the Public Utility Law, supra, contains five subsections. The following are pertinent to the present question:

"(*a*) No public utility, engaged in the transportation of passengers or property, shall, without prior order of the commission, construct its facilities across the facilities of any other such public utility or cross any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order, shall be so constructed across the facilities of any such public utility, and, *without like order, no such crossing heretofore or hereafter constructed shall be* altered, relocated or *abolished*. . . .

"(*b*) The commission is hereby vested with *exclusive* power to appropriate property for any such crossing, and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated or abolished, and the manner and conditions in or under which such crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public.

"(*c*) Upon its own motion or upon complaint, the commission shall have *exclusive* power after hearing, upon notice to all parties in interest, including the owners of adjacent property, to order any such crossing heretofore or hereafter constructed to be relocated or altered, or to be abolished upon such reasonable terms and conditions as shall be prescribed by the commission. In determining the plans and specifications for any such crossing, the commission may lay out, establish, and open such new highways as, in its opinion, may be necessary to connect such crossing with any existing highway, or make such crossing more available to public use; and may abandon or vacate such highways or portions of highways as, in the opinion of the commission, may be rendered unnecessary for public use by the construction, relocation, or abandonment of any of such crossings. The commission may order the work of construction, relocation, alteration, protection, or abolition of any crossing aforesaid

to be performed in whole or in part by any public utility or municipal corporation concerned or by the Commonwealth." (Italics supplied.)

Subsection (*a*) above quoted provides that no public utility shall abolish a crossing without the prior order of the commission; subsection (*b*) vests the commission with exclusive power to determine and prescribe the points at which, and the manner in which, crossings may be abolished, and subsection (*c*) vests the commission with exclusive power to order the abolition of crossings and the terms by which abolition shall be effected. The latter provision includes, in the exclusive power of the commission, the power to lay out, establish, and open such new highways as may be necessary for public use. This latter provision becomes very pertinent in those cases where the abolition of crossings creates cul-de-sacs for the traveling public or deprives property owners of access.

The quotations from section 409 of the Public Utility Law are included herein to stress the fact that the Public Utility Commission is the proper forum in which matters pertinent to the abolition of utility crossings should be adjudicated. The comment concerning the authority of the commission to lay out, establish, and open highways is to stress the fact that conditions often arise where both public and private interests are vitally concerned with conditions as they may exist after a crossing has been abolished.

Your letter asking for the advice herein given contains the following pertinent paragraph which might be cited as an additional reason why your commission should exercise jurisdiction in these matters:

"In connection with the crossings above or below grade, the highway in many instances is carried across or under the tracks of the railroad by bridges of considerable height, and unless the bridges are properly maintained they become unsafe and dangerous to the traveling public. If, under the Jennings decision, the

commission has no jurisdiction over such crossings after the line has been abandoned, the order of the commission with respect to the maintenance thereof is of no force or effect; therefore, no party is charged with that duty. Under these circumstances the maintenance of said bridges will be neglected and as a result thereof they will become unsafe and dangerous to the public."

That your commission has jurisdiction over the abolition of crossings in Pennsylvania on railroads actively engaged in interstate commerce hardly needs comment. The remaining question to be considered then is:

What is the jurisdiction of the commission with respect to crossings on an interstate railroad where such railroad has applied for abandonment to the Interstate Commerce Commission?

In view of the exclusive jurisdiction granted to the commission in the manner hereinbefore set forth, we are of the opinion that the Public Utility Commission should exercise jurisdiction in these matters. The decision in Jennings, Trustee, v. Pennsylvania Public Utility Commission, supra, does not alter our view, which is supported by the case of Palmer et al., Trustees, v. Massachusetts, 308 U. S. 79, the effect of which was avoided by the writer of the opinion in the Jennings case as follows (p. 579) :

"The case is not applicable here, for our state authority gave its unconditional assent to the absolute abandonment of these fifty-four miles of railroad."

Hence, it would follow that if the Pennsylvania Public Utility Commission has not consented to the abandonment of a line it could still exercise jurisdiction over crossings thereon. It should further be noted that the Superior Court spoke of "unconditional consent", which would seemingly imply that your commission could say, "Our consent to abandonment is given providing you do thus and thus to the following crossings on said line."

In the subject "Railroads", 55 Federal Digest, sec. 99, will be found a lengthy list of decisions of the United States Supreme Court which hold that contracts by a railroad are subject to the possible exercise of the State's sovereign right to require the abolition of dangerous grade crossings as well as the further proposition that:

"The state, from which railroads derive their right to occupy land within the state, has a constitutional right to insist that highway crossings shall not be made dangerous to the public, whatever may be the cost to the railroad companies; and, if it reasonably can be said that safety requires the abolition of grade crossings, neither prospective bankruptcy of the company nor its engagement in interstate commerce can take away this fundamental right of the state as sovereign of the soil."

Thus, it will be seen that certain inherent rights are vested in the States to control highway crossings of utility companies whether they be conducting interstate business or not. It does not seem reasonable that such State rights can be lost because a railroad has made application to the Interstate Commerce Commission for abandonment, and, unless and until the Public Utility Commission has consented to such abandonment, it is our opinion that crossings on such a railroad line are live crossings subject to the jurisdiction of the Public Utility Commission.

You state in your request that proceedings concerning crossings have been instituted against railroads immediately after they had made application for abandonment to the Interstate Commerce Commission. Jurisdiction thereupon attached for the commission to prescribe the terms and conditions of abandonment for such crossings and it would not be swept aside by a subsequent order of the Interstate Commerce Commission for abandonment of the line; in fact, an order of abandonment in such event would be coupled with an

implication that the line could be abandoned if the company complied with the order of your commission respecting abolition of crossings.

When the Pennsylvania Legislature vested the Public Utility Commission with exclusive authority over the abandonment of crossings, what else could it have had in mind but that crossings to be abandoned were "dead crossings" on tracks where service was to be or had been abandoned? To prevent the growth of dangerous conditions which might arise through neglected, abandoned crossings and to further prevent inconvenience to the traveling public, the legislature of Pennsylvania vested your commission with exclusive power to prescribe conditions for abandonment. This was a valid exercise of the police power, as conditions at crossings are a matter of important local concern, and action by the State is no denial of Federal control over the abandonment of interstate railroads.

The only opposite view which could be urged is that the Interstate Commerce Commission has exclusive control over the abandonment of interstate railroads and, therefore, the State or its agencies are powerless to act. If this be true, no relief could be had either before the Public Utility Commission or in the State courts of Pennsylvania. In this regard the Interstate Commerce Commission advised you by letter dated June 27, 1939:

"We are of the opinion that this is a matter which does not affect the question of public convenience and necessity but which should be adjusted between the Commonwealth and the appellant".

Both of these propositions cannot be correct, and leave the Commonwealth powerless in the matter. Present trends in constitutional construction forbid such a hopeless result and we should not assign ourselves such a position when there is possibility of achieving a better answer. See the recent case of Maurer et al., etc., v. Hamilton, Secretary of Revenue of Pennsylvania, et al., 309 U. S. 598 (1940).

The Supreme Court of the United States held in the case of South Carolina State Highway Department et al. v. Barnwell Brothers, Inc., et al., 303 U. S. 177, that the power of Congress to regulate interstate traffic does not force the States to conform to regulations which Congress might have made, but has not adopted, and does not curtail the power of the States to take measures to insure the safety and conservation of their highways. The court further said in this case (p. 189) :

"Congress, in the exercise of its plenary power to regulate interstate commerce, may determine whether the burdens imposed on it by state regulation, otherwise permissible, are too great, and may, by legislation designed to secure uniformity or in other respects to protect the national interest in the commerce, curtail to some extent the state's regulatory power. But that is a legislative, not a judicial function, to be performed in the light of the Congressional judgment of what is appropriate regulation of interstate commerce, and the extent to which, in that field, state power and local interests should be required to yield to the national authority and interest. In the absence of such legislation the judicial function, under the commerce clause [Constitution, art. I, sec. 8, cl. 3] as well as the Fourteenth Amendment, stops with the inquiry whether the state legislature in adopting regulations such as the present has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought. *Sproles* v. *Binford, supra; Stephenson* v. *Binford,* 287 U. S. 251, 272."

We find nothing in the Interstate Commerce Act, 49 U. S. C. §1, 18, 19, 20, which reserves to the Federal Government the right to control the conditions for the abandonment of crossings on interstate railroads where applications are made for certificates of the Interstate Commerce Commission for abandonment. Therefore, such matter would be subject to State regu-

lation, and it is presumed that the Interstate Commerce Commission, in the proceedings before it for abandonment, would take into consideration the outlay required for removal of crossings. See Transit Commission et al. v. United States et al., 284 U. S. 360. Congress having failed to deal with the subject of the removal of crossings on railroad lines for which the Interstate Commerce Commission has issued a certificate for abandonment, such power still rests with the State, and the Public Utility Commission can exercise jurisdiction over the abandonment of crossings thereon if it has not unconditionally consented to such abandonment. Jennings, Trustee, v. Pennsylvania Public Utility Commission, supra, can be so construed.

We are of the opinion, therefore, and you are accordingly advised, that under the provisions of section 409 of the Public Utility Law the Public Utility Commission has jurisdiction over the abolition of crossings located on a line of railroad which is a part of an interstate system or which is owned by an interstate system, where the Interstate Commerce Commission has approved the abandonment of said line, if the Public Utility Commission has not consented unconditionally to such abandonment.